Argued July 20, affirmed as modified September 14, 1960

## STATE OF OREGON *v.* BRALEY
### 355 P. 2d 467

[ 1 ]

*J. Raymond Carskadon,* Portland, argued the cause and submitted a brief for appellant.

*Charles R. Harvey,* Deputy District Attorney, Portland, argued the cause for respondent. With him on the

brief was Charles E. Raymond, District Attorney, Portland.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, O'Connell, Goodwin and Millard, Justices.

O'CONNELL, J.

The defendant, Harry William Braley, was indicted for the crime of murder in the first degree in violation of ORS 163.010 (1) for killing Judy Violet Knutson by stabbing her with a knife. The jury returned a verdict of guilty without recommendation for life imprisonment. From a judgment of death, an automatic appeal was ordered under ORS 138.810 (now ORS 138.410).

The fatal stabbing took place on Monday evening, May 19, 1958, in a rooming house in Portland in the presence of Mrs. Ella T. Landaker, the landlady, and her mother, Mrs. Theoline Olson. Defendant and the deceased, posing as husband and wife, had moved into a room on the second floor of the rooming house a few days before. On the evening in question, at about six o'clock, Judy, followed by defendant, came downstairs to the apartment occupied by Mrs. Landaker. Judy asked if she could use the telephone which was in the living room of Mrs. Landaker's apartment. The request was granted. A few minutes later Mrs. Landaker heard a commotion in the hallway. Mrs. Landaker then went to her mother's room which adjoined her apartment and a few minutes later she and her mother heard the defendant and Judy talking loudly and arguing. Mrs. Landaker returned to her living room and she observed that while Judy was in the process of making a telephone

call defendant forced her to hang up the receiver. At this time, Mrs. Landaker said that Judy "didn't seem to want to be around him. She seemed like she was trying to, oh, I don't know, get away from him." The only conversation that was reported was Judy's statement, "I wouldn't care, all I want is to see my daughter one more time." There is nothing in the transcript to indicate what prompted this statement.

After the episode just related, Mrs. Olson joined the others in the living room. Mrs. Olson and Judy sat on the davenport and defendant sat in a chair across the room. Defendant left his chair, walked over to the davenport and asked Judy to go upstairs with him and then, without any provocation, struck her a severe blow in the face with his hand or fist. Judy said, "Oh, Harry why do you do this to me." Mrs. Landaker helped Judy to the kitchen where she applied ice packs to her face. Defendant came to the kitchen doorway and said, "Is this it, Judy, is this it." Apparently, defendant then went upstairs to his room, obtained a large pointed carving or butcher knife, and returned to the kitchen. Judy said, "Harry, that's a dangerous weapon; give it to me." Mrs. Olson testified that "We started to talk nice to him and finally he gave us the knife." She took it to her room which adjoined her daughter's room on the same floor. Defendant left, saying that he was going upstairs to the bathroom. He returned and Mrs. Olson learned that he had another knife, a small paring knife, which he had in his pocket and which he showed to her. She induced defendant to give up this knife also, after which she hid it under a dresser scarf in the hallway leading to the kitchen. Apparently, at this time defendant had regained possession of the carving knife which Mrs. Olson had brought

to her room. Judy returned to the living room and, according to Mrs. Olson, the following occurred: "* * * her pocketbook was sitting there and he grabbed that and looked into it and she said, 'Harry, I haven't got no money.' And he just kind of gave a grunt and didn't answer her, aye, yes or no, but he just gave a grunt and went out for a while. Pretty soon he takes it again and she says, 'I haven't got no money, Harry' and he says, 'I know' and she said, 'What you want I haven't got.'" From time to time defendant kept insisting that Judy go upstairs with him. Mrs. Olson testified that "he was just after that woman all the time. He just hollered 'Judy, Judy' all the time." She reported that on one occasion he said, "Come upstairs with me for five minutes, Judy, I want to talk to you; it will only take five minutes." After this or a similar command, Judy said, "I am afraid."

Then defendant insisted that Judy go to a tavern with him and drink some beer. She said that she could not go as she was, referring to the condition of her blouse which was stained with blood from the blow on her face. Defendant said, "Well, go upstairs and change your blouse and you will be all right." Apparently, she had decided to accede to his command or request because she started to move toward the door following the defendant. Mrs. Landaker and Mrs. Olson also started toward the door, Mrs. Landaker with the plan to get defendant out of the room, lock the door and thus protect Judy from further harm. As they moved toward the door, Judy got behind Mrs. Landaker and Mrs. Olson. Mrs. Landaker was attempting to push defendant out when defendant quickly grasped the knife, swung around and thrust the knife into Judy. To do this defendant

charged between Mrs. Landaker and Mrs. Olson to get at Judy. Mrs. Landaker tried to hold his arm back and in the process her finger was cut on the blade. Mrs. Landaker testified that, "It happened so quickly, if my mother hadn't just moved off, he would have stabbed her with that knife. Mrs. Olson testified that, "I seen the knife coming and I had to duck because I was afraid I was going to get it, and he stabbed her then right behind us." Before she was struck, Judy cried out, "Oh, Harry, don't." Three knife wounds were found on the deceased's body, indicating three separate thrusts of the knife.

The defendant left the rooming house holding the knife in his hand and walked to a tavern where he informed the bartender that he had stabbed his wife or, as he testified, that he thought he had stabbed her. On the way to the tavern he had thrown the knife on top of the tavern before entering.

The foregoing roughly summarizes the essential facts immediately prior to and at the time of the killing. Much of the story, and perhaps the most important part of it from the standpoint of explaining such a brutal act, is not reported here, because it is not essential to the disposition of this case. The defendant does not deny that he stabbed and killed Judy Knutson. In the trial of the case his defense, apparently, was based upon the theory that because of defendant's intoxication and mental abberation he did not realize what he was doing or, at least, that he did not intend to kill the deceased.

The defendant, who took the stand, testified that he did not intend to kill Judy, that he loved her and that he could not recall the details of the scene at the time of the killing. His counsel asked him, "Now, up until the time you wielded the knife, Mr. Braley, were

you so drunk you didn't know what you were doing?" To this leading question defendant answered, "I was drunk arguing, yes."

Upon appeal six alleged errors are relied upon for reversal, several of which are now asserted in spite of the fact that at the trial the point was not raised by objection or exception. Generally speaking, a question not raised and preserved in the trial court will not be considered on appeal. *State of Oregon v. Cory*, 204 Or 235, 282 P2d 1054 (1955); *State of Oregon v. Nodine*, 198 Or 679, 259 P2d 1056 (1953); *State v. Brinkley*, 55 Or 134, 104 P 893, 105 P 708 (1909); *State of Oregon v. Abrams*, 11 Or 169, 8 P 327 (1883). This rule is applicable in criminal as well as civil cases, *State v. Avent*, 209 Or 181, 302 P2d 549 (1956); *State v. Foot You*, 24 Or 61, 32 P 1031, 33 P 537 (1893), and it applies even though the defendant was tried for the commission of a capital crime. *State v. Kelley*, 118 Or 397, 247 P 146 (1926), cert. den., 273 US 589, 47 SC 504, 71 L ed 790; *State v. Daley*, 54 Or 514, 103 P 502, 104 P 1 (1909); *State v. Magers*, 36 Or 38, 58 P 892 (1899); *State v. Anderson*, 10 Or 448 (1882); *O'Kelly v. Territory of Oregon*, 1 Or 51 (1853). The fact that appeal comes to us automatically under ORS 138.410 does not enlarge the scope of review. The rule has been relaxed on occasions, particularly in capital cases where "the court, upon an examination of the entire record, can say that the error is manifest and that the ends of justice will not otherwise be satisfied." *State v. Avent*, 209 Or 181, 183, 302 P2d 549 (1946). We turn to a consideration of the errors recited by defendant.

The most serious defect in the proceedings was the court's failure to instruct the jury with respect to the legal significance of intoxication in adjudging

the defendant's intent at the time he killed the deceased. The instruction relating to intoxication given by the court was as follows:

"Now, there is some evidence in this case tending to show that the defendant had been drinking heavily prior to the time of this incident, and was, at said time, in a state of voluntary intoxication. You are instructed that this fact, if you find it to be a fact, is not to be considered by you as a basis or reason for reducing the offense from murder in the second degree to manslaughter. Proof of voluntary intoxication alone is no defense to a charge of murder in the second degree, and the fact of being drunk or mental excitement or ungovernable rage which may be engendered by drinking intoxicating liquor, may not be considered by you to disprove malice or to reduce the offense to manslaughter."

The error assigned is the court's failure to instruct the jury in accordance with the provisions of ORS 136.400, which reads as follows:

"136.400 *Intoxication as a defense.* No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition; but whenever the actual existence of any particular motive, purpose or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act."

Defendant contends that if the idea expressed in the foregoing statute had been conveyed to the jury by a proper instruction, the jury might have found that the defendant was so intoxicated that he did not commit the act with "deliberate and premeditated malice," the state of mind required to constitute murder in the first degree. (ORS 163.010). However,

the instruction was not requested and no exception was taken for the failure of the court to give it. The harmfulness of the error, if it may be called that, is in proportion to the evidence establishing defendant's intoxication. That evidence was not strong. Both Mrs. Landaker and Mrs. Olson testified that defendant did not appear to be drunk or intoxicated. In answer to an inquiry on cross-examination as to whether defendant's conduct indicated that he had been drinking, Mrs. Olson stated, "Well, that I don't know, only what she [Judy] said that he had drank more beer than she, that's all I can go by. She could tell you the same if she was living." Defendant's employer, who talked with defendant at 3 o'clock on the day of the killing, stated that defendant was sober at that time. The bartender at the tavern to which defendant went after the killing, testified that defendant gave no indication whatsoever of intoxication.

There was evidence that defendant and Judy had been drinking during the afternoon of May 19. Defendant testified that he and Judy had worked until 6 a.m. on that day; that they slept until 3:30 p.m.; that they drank a quart of beer while dressing and then left to draw a part of their wages. Defendant said that he had a "shot" of whiskey and Judy had a glass of beer at the St. Francis Hotel. Then they went to another tavern and had "a few beers"; thence to another tavern and had two pitchers of beer (each containing approximately 6 six-ounce glasses); and thence to another tavern for another and final glass of beer before returning to their room at about 7 o'clock. Defendant stated that he also took two benzedrine tablets. He said that he took the tablets "to work that night."

■■ Viewing the evidence in a light most favorable to the defendant, there is little to support the contention that he was so intoxicated that his act could not have been premeditated. There is the possibility that the jury might have concluded that the combination of the beer, liquor and benzedrine consumed by the defendant rendered him incapable of premeditated murder. That possibility is not sufficient to entitle defendant to a new trial, no exception having been taken. ORS 17.505, 17.510, 136.330 (2). On the other hand, the fact that reversible error is not established through proper exception does not preclude us from considering the lack of a full instruction as a basis for the reversal or modification of the judgment from which the appeal is taken. *State v. Bouse,* 199 Or 676, 264 P2d 800 (1953); *State v. Pace,* 187 Or 498, 212 P2d 755 (1949); *People v. Murray,* 72 Mich 10, 40 NW 29 (1888); *State v. Taylor,* 32 N M 163, 252 P 984 (1927); *Ohama v. State,* 24 Wyo 513, 161 P 558 (1916). Cf., *State of Oregon v. Nodine,* 198 Or 679, 259 P2d 1056 (1953); *State v. Folkes,* 174 Or 568, 150 P2d 17 (1944), cert. den., 323 US 779, 65 SC 189, 89 L ed 622. See: *State v. Cody,* 18 Or 506, 23 P 891, 24 P 895 (1890); Orfield, The Scope of Appeal in Criminal Cases, 84 U Pa L Rev 825, 840-843 (1936). Since we are dealing here with a man's life, and since there is the possibility, although slight, that he might have been benefited by the instruction referred to, we are constrained to seek some solution which takes account of that possible benefit. Cf., *State v. Holbrook,* 98 Or 43, 106, 188 P 947, 192 P 640, 193 P 434 (1920).

Affording the defendant a new trial is one obvious solution. But, considering the overwhelming proof that defendant was at least guilty of second degree

murder, it does not seem reasonable to impose upon the citizens of this state the expense and inconvenience of another long trial if some other method of disposing of the case is legally acceptable and consonant with justice. We believe that such a method is available.

 As an appellate court, we have the inherent power to modify the judgment of a lower court. *State ex rel Moltzner v. Mott*, 163 Or 631, 97 P2d 950 (1940); *State v. Ragan et al.*, 123 Or 521, 262 P 954 (1928); *Winslow v. Burge*, 115 Or 375, 237 P 979 (1925). See: Lusk, Forty-Five Years of Article VII, Section 3, Constitution of Oregon, 35 Or L Rev 1 (1955); Reduction of Criminal Sentences on Appeal: II, 37 Colum L Rev 762, 771 (1938); Comment, 18 Calif L Rev 320 (1930). The constitutional limitation upon our power does not go so far as to preclude us in all cases from modifying the verdict of a jury. Under Article VII, § 3, we have the power to modify a verdict under certain circumstances, and we may exercise this power by reducing the offense if we believe that the defendant was improperly convicted of the offense charged but was guilty of a lesser included crime. It was so held in *State v. Ragan et al.*, 123 Or 521, 262 P 954 (1928). In that case defendant was convicted of the crime of assault and robbery, being armed with a dangerous weapon. The instruction to the jury relating to the defendant's burden of proof to overcome the presumption that the gun was loaded was erroneous. Relying upon Article VII, § 3, the court remanded the case with directions to enter a judgment of conviction for the crime of assault with the intent to rob. The error in the instructions related only to the greater crime charged and did not affect the lesser included crime. The court simply excised a part of

the verdict and left intact and enforceable that part which was free from error. So viewed, the court did not re-examine the jury's verdict in the sense that the facts of the case were reappraised on appeal. Note, 7 Or L Rev 349 (1928); Lacy, Admissibility of Evidence of Crimes not Charged in the Indictment, 31 Or L Rev 267, 287, note 72 (1952). A similar process will dispose of the case at bar; the judgment can be reduced to second degree murder. It is possible that the instant case differs in one respect from *State v. Ragan,* supra. The alleged error we are considering could, theoretically, at least, have had effect on both the crime of first degree murder and the lesser included crime of second degree murder. But a consideration of the evidence leaves no doubt whatsoever that the only possible harm to the defendant's case that could have resulted from the failure to give the instruction on intoxication, was the possibility already suggested, that the jury might have found that defendant had not committed a premeditated act. After a very careful consideration of the record, we are of the opinion that the judgment should be reduced to conviction for second degree murder.

If this be deemed a re-examination of the jury's verdict, we are of the opinion that Article VII, § 3, Oregon Constitution, empowers us to make it. *State of Oregon v. Cahill,* 208 Or 538, 293 P2d 169, 298 P2d 214 (1956), cert. den., 352 US 895, 77 SC 132, 1 L ed 2d 87. See also: Orfield, Appellate Review of the Facts in Criminal Cases, 12 F R D 311. That article was designed to preserve the jury's verdict only where a modification of it would be harmful to the person relying upon it. This idea is explicitly stated in the portion of the article which reads:

"* * * Provided, that nothing in this section

shall be construed to authorize the supreme court
to find the defendant in a criminal case guilty of
an offense for which a greater penalty is provided
than that of which the accused was convicted in
the lower court."

Since there was no error which defendant in the in-
stant case could assert as a matter of right, he could
not possibly be harmed by our action in reducing the
verdict and judgment to second degree murder, and
he could not, therefore, contend that his constitutional
rights were invaded. *Corlew v. State,* 181 Tenn 220,
180 SW2d 900 (1944), commented upon in 19 Tenn
L Rev 807 (1947). We wish to re-emphasize the fact
that the evidence is undisputed that defendant is
guilty of causing the death of Judy Knutson. The
evidence is also clear that the act was accompanied
by cruel and vicious conduct which leaves no room
for mitigation unless, as we have suggested, the de-
fendant's mind had been so affected by intoxicants
that he lacked the premeditated malice required for
first degree murder. But that is the fullest extent to
which the mitigation could possibly go and, con-
sequently, the minimum crime defendant could be
regarded as having committed was second degree
murder. Perhaps the state should have another op-
portunity to convict the defendant of first degree
murder, but the state has conceded that a judgment
of second degree murder is preferable to a remand
for new trial.

The dissent states that: ". . . if the defendant
was so inebriated . . . that he was incapable of
'deliberate and premeditated malice . . .' I can not
bring myself to believe . . . he was nevertheless
capable of 'purposely and maliciously' taking the
life. . . ."

16

 The error in this reasoning will be apparent upon an examination of the following authorities: Weihofen, Insanity as a Defense in the Criminal Law (1933); Weihofen and Overholser, Mental Disorder Affecting the Degree of Crime, 56 Yale L J 959 (1947). It may be that the distinction between first and second degree murder is "too vague to be continued in our law," (Cardozo, Law and Literature, 97, 99-101, quoted in Michael and Wechsler, Criminal Law and Its Administration, p. 169 (1940)) but until the legislature abolishes the distinction we must proceed as best we can on the assumption that the line of separation can be drawn. The line is drawn to separate acts which are premeditated and acts which are not. An act may lack premeditation and still be done with the purpose of taking another's life. From a legal standpoint, it is assumed that intoxication may so affect the mind that premeditation is lacking and yet leave the defendant with a mental capacity to commit second degree murder. This is clearly stated in *Bishop v. United States,* 107 F2d 297, 301-302:

> "Thus, voluntary intoxication will not excuse murder, but it may negative the ability of the defendant to form the specific intent to kill, or the deliberation and premeditation necessary to constitute first degree murder, in which event there is a reduction to second degree murder."

For other cases and a more extended treatment of the question see, Weihofen, op. cit. supra, pp. 100-103, and Weihofen and Overholser, op. cit. supra, passim. Wharton's Criminal Law and Procedure, Vol. I, §§ 44, 45 (1957); *Hopt v. People,* 104 US 631, 26 L ed 873 (1881); *United States v. Dye,* 221 F2d 763 (3rd Cir 1955); *People v. Griggs,* 17 Cal2d 621, 110 P2d 1031 (1941); *People v. Crumble,* 286 NY 24,

35 NE2d 634 (1941). Cf., *Fisher v. United States,* 328 US 463 (1945) (insanity) and especially, dissent of Justice Murphy, pp. 490-494.

 It is alleged that the trial court erred in permitting the attorney for the state to make certain prejudicial statements to the jury. Again, defendant's counsel made no objection to these statements and consequently the alleged error was not saved as a basis for appeal. From our reading of the record, we surmise that no objection was made because there was nothing said by state's counsel which seriously prejudiced defendant's case. Defendant sets out as a separate assignment of error the fact that the prosecutor commented to the jury on the defendant's previous criminal record. Defendant himself had testified as to his criminal record. The jury was instructed that defendant's previous record was not to be taken as evidence that he committed the crime with which he was charged. No exception or objection was made to the prosecutor's comment. This does not constitute reversible error.

 It is also alleged that the court erred in failing to instruct the jury to disregard certain testimony which was improperly received and which was highly prejudicial to the defendant. In most of the instances referred to by defendant, no objection or exception was made to the prosecutor's comment. This does not constitute reversible error.

 It is also alleged that the court erred in failing to instruct the jury to disregard certain testimony which was improperly received and which was highly prejudicial to the defendant. In most of the instances referred to by defendant, no objection or exception was interposed. Where the court did rule on the defendant's objections and motions, the ruling was

correctly made. There was no error in this aspect of the trial.

■■■■ Error is assigned on the ground that the trial court failed to give the statutory instruction on the type of second degree murder defined in ORS 163.020 (2) which reads as follows:

"(2) Any person who kills another by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any design to effect the death of any particular individual, is guilty of murder in the second degree."

Defendant did not request an instruction embodying the elements of second degree murder under ORS 163.020 (2), nor did he take an exception for the failure to give the instruction. Therefore, he is not entitled to assert the alleged error on appeal. We have held that if no exception is taken upon the failure to give an instruction on an included crime, the alleged error may not be asserted on appeal. *State of Oregon v. Nodine,* 198 Or 679, 259 P2d 1056 (1953); *State v. Duffy et al.,* 135 Or 290, 295 P 953 (1931); *State v. Reyner,* 50 Or 224, 91 P 301 (1907). Contra, *State v. Cody,* 18 Or 506, 23 P 891, 24 P 895 (1890). The state points out that it would have been error to give such an instruction in this case, because there are elements in the crime defined in ORS 163.020 (2) which are not included in the crime of first degree murder, and the defendant was not charged in the indictment with the former type of crime. Since the alleged error was not preserved by proper exception, we need not pass upon the validity of the state's argument.

■■■ Defendant alleges that error was committed in failing to instruct the jury that ten of their number

could concur in a verdict of not guilty, and in not submitting to the jury a not guilty verdict form for their consideration. No exception was taken. It is urged, however, that the error was so prejudicial to the defendant that we should take notice of it under Rule 46 of our rules. We do not think that defendant's rights were seriously affected by the error. The instructions to the jury made it clear that a verdict of not guilty could be returned. The jury was carefully instructed on the presumption of innocence favoring the defendant, and on the state's burden of proof and the consequence of not carrying it. The instruction relating to the number of votes required for conviction was as follows:

> "Now, ladies and gentlemen of the jury, with the exception of the crime of murder in the first degree, if your verdict is for murder in the first degree as charged in the indictment, then your verdict must be unanimous. If your verdict is guilty of any of the lesser degrees of crime as I have defined and explained to you, then your verdict need not be unanimous. Ten members of the jury can bring in a verdict in this case against the defendant or—leave out that last remark—by ten members only concurring. You understand what I mean? Just one verdict which requires your verdict to be unanimous out of all the verdicts I have submitted to you."

From the other instructions the members of the jury were made aware of their privilege to bring back a verdict of acquittal. It will be noted that the court charged that "[i]f your verdict is guilty of any lesser degrees of crime as I have defined and explained to you, then your verdict need not be unanimous." Would the jury conclude that, although ten votes were necessary for a verdict of a lesser crime, a unanimous vote would be required for acquittal? We believe that

the jury would draw the reasonable inference that ten of their number could bring in a verdict of not guilty.

There is no doubt that error was committed in failing to submit the form for a not guilty verdict. The sole question is whether the error was prejudicial. Since no exception was taken, the defendant cannot, as a matter of right, demand a reversal of the judgment. He is entitled to a reversal only if, upon our review of the record, we find that the procedure which was adopted did not satisfy the ends of justice. *State v. Avent,* 209 Or 181, 302 P2d 549 (1946). We make that review under the authority of Article VII, § 3. To reverse the judgment we must find that defendant was deprived of the fundamentals of a fair trial. *State v. Bouse,* 199 Or 676, 264 P2d 800 (1953); *State of Oregon v. Nodine,* 198 Or 679, 259 P2d 1056 (1953). We are convinced that the court's failure to include the not guilty verdict form did not deprive the defendant of a fair trial. We reach that conclusion after a thorough appraisal of all of the evidence in the case, and after a careful examination of all of the instructions. No constitutional right of the defendant was invaded. Cf., *State v. Estabrook,* 162 Or 476, 91 P2d 838 (1939). But cf., *Commonwealth v. Edwards,* 394 Pa 335, 147 A2d 313 (1959).

The cause is remanded with directions to enter a judgment of conviction of murder in the second degree and to sentence defendant in accordance with ORS 163.020 (4).

Mr. Carskadon, defendant's counsel on appeal, did not take part in the trial of this case.

Affirmed as modified.

McALLISTER, C.J., dissenting.

I agree that the trial court erred in failing to

instruct the jury in accordance with the provisions of ORS 136.400 and further agree that said error was prejudicial. I believe we should remand the case to the circuit court for a new trial.

ROSSMAN, J., dissenting.

I agree with the majority that the trial judge committed error when he instructed the jury as to the effect which it could give to the defendant's testimony that he was under the influence of intoxicating liquor at the time of the stabbing. The majority hold that the instruction was erroneous, and, based upon that holding, reduce the defendant's conviction from first degree murder to second degree murder. They indicate that if the jury had been properly instructed upon the effect of the alcoholic beverages and benzedrine tablets, which he swore he consumed prior to the stabbing, it is possible that the jury would have reasoned that he was incapable of the "deliberate and premeditated malice" which ORS 163.010 demands that an accused must have before a verdict of first degree murder can be returned against him.

But if the defendant was so inebriated at the time of the stabbing that he was incapable of "deliberate and premeditated malice" as that element of first degree murder is set forth in ORS 163.010, I can not bring myself to believe that he was nevertheless capable of "purposely and maliciously" taking the life of his paramour. He swore that he did not intend to kill the woman. The three words, last quoted, form a part of ORS 163.020 which specifies the component elements of second degree murder. For any one to do an act purposely, whether the act is criminal or commendable, means that he did it wittingly, and knowingly. If an act is done brutally the law may ascribe to the accused malice, and thus obviate the necessity

of supplying other evidence of that element of the crime. But the law will not ascribe to a defendant in a criminal case the element of purpose. The latter must be established by evidence.

No one can do an act purposely unless he has such possession of his mental faculties that he is capable of at least a semblance of thinking. If this defendant, at the fatal moment when he plunged a knife into his mistress, was so inebriated that this court must hold that he was incapable of "deliberate and premeditated malice," I do not believe that it can say that he was nevertheless capable of "purposely" taking the woman's life.

Our statute concerning intoxication (ORS 136.400) in cases of this kind reads:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition; but whenever the actual existence of any particular motive, purpose or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act."

It will be observed that the statute just quoted authorizes the jury to "take into consideration the fact that the defendant was intoxicated at the time, in determining the purpose * * * with which he committed the act." The presence of the word "purpose" in that act is worthy of attention. We noticed that ORS 163.020 requires the state to show that any one who is accused of second degree murder took his victim's life "purposely." Accordingly, this court cannot adjudge the defendant guilty of second degree murder unless it can say that he performed an act

purposely, that is, wittingly or intentionally, whereby the woman was brought to her death; but, if he was so intoxicated that he was incapable of premeditation or deliberation, it surely can not say that he was capable of pursuing a purpose. The decisions which the majority cite do not support the majority's position. Those cases were not confronted with a statute governing second degree murder which contained the element of "purposely," and which, therefore, required the court to make a finding upon that subject if it proposed to hold the defendant guilty of second degree murder.

The majority declare that their action is warranted by Article VII, Sec. 3, Constitution of Oregon. They believe that that section of our Constitution enables them (1) to weigh the evidence upon intoxication; (2) to find that the defendant was sufficiently inebriated so that he was incapable of deliberate and premeditated malice and (3) to find that he retained sufficient of his mental powers that he was capable of purposely taking his victim's life.

It is highly important that we bear in mind the fact that the defendant has never had a jury trial upon "intoxication," "purposely" and "deliberate and premeditated malice." Due to the grave error that the trial judge committed in charging the jury that it deny to the defendant any effect whatever from his evidence which showed intoxication, he has not had trial by jury upon those phases of his case. Article VII, Sec. 3 does not justify the majority's course. That part of our Constitution expressly says, "the right of trial by jury shall be preserved."

*State v. Ragan et al.,* 123 Or 521, 262 P 954, does not authorize the majority to deny the defendant trial by jury. In that case the defendant was found guilty

of the crime of assault and robery, being armed with a dangerous weapon. The trial was free of error with the exception of the fact that the instructions misdefined the nature of a dangerous weapon. This court remanded the case to the circuit court with instructions to enter against the defendant a judgment of guilty of assault and robbery and sentence him upon that lesser crime. Thus, that case did not involve the re-examination of any evidence.

I am satisfied that if this court, upon examining the evidence, can not say that the defendant was capable of deliberate and premeditated malice, it can not say that he took the woman's life purposely. The evidence was clearly capable of proving that the defendant was motivated by deliberate and premeditated malice. For example, it showed that (1) the defendant spoke to his paramour loudly and in argumentative terms which possibly denoted hostility; (2) he demanded that the woman return upstairs with him; (3) he roughly snatched a telephone from her hands; (4) he struck the woman a severe blow which caused bleeding to take place; (5) he went upstairs and obtained a large knife; (6) after he had been induced to surrender the knife he went upstairs again and obtained a second knife and (7) after he had been persuaded to surrender the second knife he found the first knife in the place where his landlady had attempted to conceal it. The evidence just summarized is certainly strong proof of deliberate and premeditated malice. The defendant's brief says:

> "He does not deny that he participated in the nefarious events of the evening of May 19, 1958, nor does he deny that he stabbed Judith Violet Knutson, but the defendant does state that he loved the deceased and did not intend to kill her. The purpose of the knife was only to frighten her."

Accordingly, a purpose to kill was as much an issue in the case as "deliberate and premeditated malice." Since the stabbing was not contested and since "the nefarious events of the evening of May 19, 1958," were conceded, the majority, by themselves resolving the issue of purpose, have denied to the defendant trial by jury upon one of the very few issues of the case.

We should do with this case, according to my belief, the same as we do with other criminal appeals in which prejudicial error is found. That is, we should remand the case to the circuit court for retrial.

I dissent.

MILLARD, J., concurs in this dissent.